**UNITED STATES of America, Appellee,**

v.

**Jack ROSENGARTEN, Appellant.**

**No. 170, Docket 29752.**

United States Court of Appeals
Second Circuit.

Argued Dec. 9, 1965.

Decided Feb. 7, 1966.

264

Henry K. Chapman, New York City (Irving Rader, New York City, of counsel), for appellant.

Michael S. Fawer, New York City, (Robert M. Morgenthau, U. S. Atty., for S. D. New York; Otto G. Obermaier, Asst. U. S. Atty., of counsel), for appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

Jack Rosengarten, having waived trial by jury, was convicted by Judge Sugarman in the District Court for the Southern District of New York, of having wilfully and knowingly received, concealed and stored jewelry of a value of more than $5,000, which was moving in interstate commerce, knowing the same to have been stolen. 18 U.S.C. § 2315. Although the penalty imposed was only a fine of $433,[1] we do not minimize the consequences of the conviction.

At the trial, in which Rosengarten was prosecuted along with his employee, Nathan Katzen, the Government introduced a stipulation that a Mrs. Jones would testify that on December 5, 1962, her suitcase was stolen in Richmond, Virginia, from an automobile owned by her

1. We were told at argument that the judge arrived at this figure by deducting from $1000 the $567 which Rosengarten claimed he had paid for the jewelry.

fiancé; that the suitcase contained six items of jewelry; that the purchase price of five of these was $4724; that the sixth item was a ring with a Ceylon sapphire and 34 round diamonds, shipped on consignment from David Webb, a New York jeweler, along with a memorandum giving the prices of the jewels and an artist's conception of a proposed setting for the sapphire. The Government called the convicted thief, Charles Gilliam, who admitted that he and two others had stolen the suitcase and explained how he had disposed of the jewelry on returning to New York a few days after the theft. Somewhat shabbily dressed and in need of a shave, he had entered a jewelry store, conceded to be owned by Rosengarten, and, when approached by Katzen, pulled a pair of earrings out of his pocket. Katzen offered and paid him $25 for the jewelry, and asked what his name was and whether he had any more. Gilliam went off and returned with the rest of the loot, whereupon Katzen took him into a back room. After seeing the jewelry Katzen offered Gilliam $50 for the lot, to which he responded with a demand for $10,000; the deal was closed for $400. Gilliam testified that for both transactions Katzen got the money from another person but was unable to identify Rosengarten as the man. The stipulated testimony of Mrs. Jones valued the earrings at $100 and an employee of David Webb testified that the sapphire ring carried on the shank the initials of Van Cleef & Arpels ("Van C and A"), and had been priced in the memorandum to Mrs. Jones at $17,800.[2] Two FBI agents testified as to how they had located the stolen jewelry at Rosengarten's store, and the Government introduced his statement to the agents which clearly identified him as the other person named by Gilliam.

At the end of the Government's case, counsel representing both defendants moved for acquittal on the grounds that the Government had failed to establish either that the jewelry was known to have been stolen or that the value was at least $5,000. The judge reserved decision on the motion. The defendants then proceeded to contradict Gilliam's version of the transactions in certain respects, supporting their story by written entries in a purchase record book; they also testified to an attempt by Rosengarten to verify the identity of Gilliam, and to the preparation and mailing to the New York Police Department of a purchase record form required to facilitate the tracing of stolen property. Rosengarten insisted that he had learned of the Van Cleef & Arpels marking only when it was pointed out to him by one of the FBI agents and that he made an appropriate entry in his purchase record at that time. In addition, a fellow jeweler testified that only a rare expert could tell without tests whether the sapphire was real and hence extremely valuable, or synthetic with a value of only $25. Another jeweler, Appelbaum, declared that he would not have paid more than $435 for the items other than the sapphire ring and that, merely upon examining the latter, he would have regarded it as synthetic. Cross-examination of the defense witnesses, however, revealed a conflict as to whether Rosengarten's own purchase record had been modified after confrontation with the FBI agents and a description of what were "sapphires" in his own record as undistinguished "blue stones" in his report to the police. Moreover, the jeweler who had insisted he would have regarded the large sapphire as synthetic conceded that on first seeing the marking "Van C and A" on the shank of the ring, he had declared that he "would be suspicious of this being a real stone." In rebuttal the Government called an employee of Van Cleef & Arpels who identified the

---

2. Gilliam testified that he had exhibited to Katzen this memorandum, torn so as not to show Mrs. Jones' name. However, since the judge's acquittal of Katzen would indicate disbelief in this testimony, we disregard it for the purpose of determining the sufficiency of the evidence against Rosengarten.

stone as a real sapphire with a value between $10,000 and $12,000 for the stone alone; he thought such an identification could be made by use of an ordinary jeweler's loupe "if a person has worked with sapphires for any length of time" but not otherwise.[3] At the close of all the evidence, the trial judge acquitted Katzen but found Rosengarten guilty.

The contentions on appeal, earnestly and effectively pressed upon us by Rosengarten's counsel, are that the Government failed to make out a sufficient case by its proof in chief or, in the alternative, on the evidence as a whole— a conclusion claimed to be compelled by the trial court's acquittal of Katzen— and that the acquittal of the latter was fatally inconsistent with the conviction of Rosengarten.

It is settled law that a defendant who offers evidence after the denial of a motion for acquittal at the close of the Government's case in chief waives any claim as to the sufficiency of that case considered alone. United States v. Calderon, 348 U.S. 160, 164 n. 1, 75 S.Ct. 186, 99 L.Ed. 202 (1954); but see The Motion for Acquittal: a Neglected Safeguard, 70 Yale L.J. 1151 (1961). We have applied this rule when, as here, the judge ignored the command of F.R.Crim.P. 29(a) and reserved decision on such a motion, see United States v. Goldstein, 168 F.2d 666, 669–670 (2 Cir. 1948), and the Supreme Court's approving citation of the Goldstein decision in Calderon, supra, indicates that it perceives no basis for distinguishing between the two situations, at least in the absence of a demand for a ruling on the motion and explicit refusal by the judge to obey the mandate of the Rule. Quite apart from this, we would consider the Government's case in chief sufficient to support Rosengarten's conviction. The testimony of the David

Webb employee was enough to convince a judge beyond a reasonable doubt that the sapphire ring had a value sufficient to fill the gap between the $4724 figure stipulated as to the other jewelry and the $5000 required by the statute; and knowledge that the goods were stolen could have been inferred from Gilliam's testimony as to the circumstances surrounding the purchase, in particular his appearance, the value of the jewelry and the conduct of the two defendants.

The serious question is whether when all the testimony had been heard there was sufficient evidence for the judge to be convinced beyond a reasonable doubt that Rosengarten knew the jewelry to have been stolen. The most significant evidence to create such a doubt was Appelbaum's testimony that he would have made a comparable valuation of the jewelry and considered the sapphire to be synthetic, and Rosengarten's own proof of having submitted to the police department a purchase record calling attention to the transaction. The trial court, however, was not bound to credit Appelbaum's insistence that he would have paid only $435 for items valued at over ten times that sum by the stipulated testimony of the owner. And it was not barred from concluding that the good faith that might otherwise be inferred from the purchase report was compromised by the discrepancy between the description of "sapphires" in Rosengarten's own records and of "blue stones" in the report; a conclusion that Rosengarten had acted with less than complete candor might have been supported by a finding that he had tampered with his own records after the visit from the FBI agents. In any case, the trial judge had the advantage of seeing the witnesses, and Rosengarten and Appelbaum may have made a poor impression.[4]

3. Rosengarten had denied any such experience.

4. It is indeed anomalous that, with the grave issues at stake in criminal trials, an appellate court reviewing a conviction in a case tried to a judge should have to rest its decision on conjecture, which in civil suits and in the review of admin-

Looking only at what we have before us, we are unable to say the judge exceeded the bounds of reason in being convinced of Rosengarten's guilt beyond a reasonable doubt.

 The very closeness of the issue as to Rosengarten shows why there was no inherent inconsistency between his conviction and the acquittal of Katzen. Rosengarten had been associated with the jewelry business for nearly forty years and engaged in the purchase and sale of jewels for over ten; Katzen, a man of 81, had been in the trade less than three years and had worked for Rosengarten less than one. Moreover, the entries in the purchase records maintained in the store and submitted to the police were made by Rosengarten. If the judge had credited Gilliam's testimony that he had showed Katzen the memorandum from David Webb showing the price of the sapphire ring, see fn. 2, a conclusion of Katzen's innocence and Rosengarten's guilt might indeed be more than an appellate court should swallow. See United States v. Maybury, 274 F.2d 899, 903 (2 Cir. 1960). But the judge could well have disbelieved that testimony and have concluded that Katzen's limited experience in the jewelry business left reasonable doubt whether he knew the goods had been stolen, whereas Rosengarten's greater expertise and his conduct in filling out the purchase records sufficiently proved guilty knowledge. Compare United States v. Sells, 325 F.2d 161 (2 Cir. 1963); United States v. Wilson, 342 F.2d 43 (2 Cir. 1965). Thus the result was not "wholly irreconcilable with any rational theory," and, while we adhere to the Maybury principle, "it should not be expanded to include cases where it is merely difficult to find a truly satisfying explanation for the differing conclusions." United States v. Wilson, supra, 342 F.2d at 45.

Affirmed.

istrative action is largely eliminated by the salutary requirement of findings. See F.R.Civ.P. 52(a) and Administrative Pro-

cedure Act § 8(b); United States v. Forness, 125 F.2d 928, 942 (2 Cir. 1942).